*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ERNEST FRANK THOMAS, | ) | |
| | ) | Supreme Court No. S-15371 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-10-10515 CI |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF | ) | No. 7121 - August 26, 2016 |
| ENVIRONMENTAL | ) | |
| CONSERVATION, DIVISION OF | ) | |
| ENVIRONMENTAL HEALTH, | ) | |
| FOOD SAFETY & SANITATION, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: Ernest Frank Thomas, pro se, Eden, New York, Appellant. Margaret Paton Walsh and Aesha Pallesen, Assistant Attorneys General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Fabe, Winfree, Maassen, and Bolger, Justices.

MAASSEN, Justice.

# I. INTRODUCTION

A state agency terminated the employment of a seafood inspector following a contentious airport inspection that resulted in complaints by a seafood processor and an airline. The inspector contends that his termination was actually in retaliation for an ethics complaint he had filed over a year earlier against the agency's director. The superior court decided most of the inspector's claims against him on summary judgment but allowed one claim, alleging a violation of his free speech rights, to go to trial. The jury found that the ethics complaint was not a substantial or motivating factor in the inspector's termination, and the superior court entered final judgment for the agency.

On appeal, the inspector argues that the superior court erred in granting summary judgment, in denying his motion for a new trial based on allegations of jury misconduct, and in awarding attorney's fees to the agency. Finding no error, we affirm.

# II. FACTS AND PROCEEDINGS

## A. Thomas's Discipline History And His Ethics Complaint

Ernest Thomas was employed by the Alaska Department of Environmental Conservation (the Department or the State) as a seafood inspector for more than 20 years. Though he had previous instances of discipline, the principal storyline of his lawsuit began on February 12, 2008. Thomas spoke that day with an unknown member of the public about new seafood regulations. Thomas's acting supervisor, Duane McIntire, asked Thomas to find the person's name for follow-up. After several reminders, Thomas sent McIntire a "menu of telephone numbers that perhaps are the correct person," along with the advice "happy hunting." McIntire asked human resources specialists in the Department for help in responding to Thomas's email. Based on their recommendations, he ultimately emailed Thomas: "My expectation is that you politely and professionally[] make the calls to track down who you spoke to." Thomas responded, and included in his lengthy email was this: "Your patronizing message is not appreciated. . . . I believed

you to be a person of some principle and now see after today that I was wrong. Please do not allow your new found acting supervisory position to swell your head too much . . . ."

The Department initiated an investigation of Thomas's behavior in the exchange, serving him with a notice of investigatory hearing in the early afternoon of February 14. A few hours later Thomas sent an email to an assistant attorney general, alleging that the Department's director, Kristin Ryan, had committed an ethics violation. Thomas alleged that he had recently discovered Ryan's marriage to a seafood industry lobbyist, creating a conflict of interest, and that she was unfairly punishing him for his discovery. At the bottom of the email Thomas asserted: "This is my formal complaint to commence an investigation: This is my formal request for whistleblower protections to be implemented for myself."[1]

The assistant attorney general sent Thomas a confidential reply on February 20. She informed him that the information he had provided did "not appear to allege a violation of the Ethics Act by Ms. Ryan," that his invocation of whistleblower status was without effect, and that if he believed he was the subject of retaliation he should pursue the grievance procedures available through his collective bargaining agreement.

On February 25 Thomas received a written reprimand from the Department for his "inappropriate and unprofessional behavior" in the course of his email exchange with McIntire. Over the next year he was disciplined several more times for disrespectful and argumentative emails, derogatory remarks about coworkers, and ignoring the chain of command. The complaints against him prompted three more investigatory hearings and resulted in three suspensions without pay (one for three days and two for five), as well as written admonitions. A May 2009 letter to Thomas from his

---

[1]     Emphasis omitted.

new supervisor, Robert Pressley, outlined Thomas's history of discipline since early 2008 and warned him "that any further violations may result in further discipline up to and including dismissal."

**B.      The Cordova Incident And Thomas's Termination**

On August 25, 2009, Thomas traveled to Cordova to conduct inspections at area seafood facilities. The next day a representative of Ocean Beauty Seafoods sent an email to Pressley and Ryan enclosing a report of an incident at the Cordova airport. According to the report, when Thomas got off the plane in Cordova he approached the gate counter, "asked for the [Alaska Airlines] manager[,] . . . confronted her in an abusive manner[,] and complain[ed] that the fish on the tarmac . . . had been sitting too long in 60[-]degree weather and he was going to do something about it."[2] The manager asked Thomas for identification, but he could not comply because it was in his checked luggage; he instead gave her a business card. When the manager pressed him for an official identification, Thomas engaged in "another round of complaints and general abuse" until his luggage arrived, when "he finally produced [a] very old and tattered [Department] ID."

As the email described it, the Alaska Airlines manager informed Thomas that "all the cases had already been TSA screened and that Ocean Beauty was part of the screened facility program." The email said that Thomas "then threw another tantrum and insisted on removing a case of [Ocean Beauty] fish from the tarmac." The manager contacted her cargo supervisor, who spoke to Thomas on the phone, describing this conversation later as a "loud, unpleasant and non-productive communication." Local police at the airport contacted state troopers, who authorized Thomas's inspection.

---

[2]      According to the report, Alaska Airlines had moved the pallets of frozen fish "out on the tarmac directly from the cooler only 5 minutes before the aircraft landed."

According to Ocean Beauty's report, "Thomas had produced a simple thermometer early on in [the] confrontation and walked around with it, took it to the bathroom and later laid it on the ticket counter; no attempt was made to sanitize it in any way." When the case of fish was produced for his inspection, he opened it, "plunge[d] his hands into the fish cavities without gloves," and "claimed the flesh temperature registered 40 degrees."[3] Alaska Airlines repackaged the box of fish, but after the inspection Ocean Beauty could no longer attest to its quality and therefore instructed its customer to destroy it. According to Ocean Beauty's report, this entire process delayed the aircraft's departure by 25 minutes.

Upon receipt of Ocean Beauty's report — and a corroborating complaint from Alaska Airlines — Ronald Klein, manager of the Department's Food Safety and Sanitation Program, asked for investigative assistance from the Environmental Crimes Unit. The Unit was given the Department's inspection protocols and interviewed six witnesses, though not Thomas. It submitted a report to the Department in early September 2009, which largely substantiated Ocean Beauty's description of the incident.

Following an investigatory hearing on September 18, the Department terminated Thomas's employment because of the Cordova incident. The September 23 termination letter advised Thomas that he had shown poor judgment, failed to follow established protocols, displayed highly inappropriate behavior, and communicated unprofessionally. The letter took note of Thomas's history of warnings and discipline for similar behavior and concluded that he should have known "what management's

---

[3]     Ocean Beauty questioned the accuracy of this result, but it was within the range allowed for safe transport, as Thomas acknowledged at the later investigatory hearing. *See* 18 Alaska Administrative Code (AAC) 34.105(c) (2016) (providing that "[t]he processor shall hold seafood products upon receipt at a temperature of not more than 45º Fahrenheit until processing of the seafood product begins").

expectations [were] regarding . . . appropriate communication." The day after he received this letter Thomas tendered his resignation.

### C. Thomas's Lawsuit

Thomas filed a complaint against the State in September 2010, alleging nine causes of action. An amended complaint trimmed away all non-employment-related claims, leaving his assertions that the State (1) breached the covenant of good faith and fair dealing; (2) violated his First Amendment rights; (3) deprived him of due process in the disciplinary proceedings; (4) violated the Alaska Whistleblower Act; and (5) wrongfully retaliated against him. The State moved for summary judgment on all these claims on grounds that there was no genuine dispute about the reasons for Thomas's dismissal, and the superior court granted the motion.

Thomas moved for reconsideration, which the superior court granted only as to his claim that he had been terminated for exercising his First Amendment rights, i.e., bringing his ethics complaint against the director. The claim was tried to a jury. During ten days of trial the parties submitted several hundred exhibits, and the jury heard from 14 witnesses. The jury deliberated for two hours before returning a verdict for the State, answering "no" to the question, "Was Ernest Thomas's filing of the ethics complaint against Director Ryan a substantial or motivating factor for the State of Alaska's termination of his employment?"

The superior court denied Thomas's motion for a new trial, which was based largely on allegations of juror misconduct. The court also awarded the State attorney's fees of $75,000. Thomas appeals.

## III. STANDARDS OF REVIEW

"We review a grant of summary judgment de novo to 'determine whether any genuine issue of material fact exists and whether the moving party is entitled to

judgment on the law applicable to the established facts.' "[4] " 'Whether the evidence presented a genuine issue of material fact is a question of law,' and '[w]e draw all factual inferences in favor of, and view the facts in the light most favorable to, the party against whom summary judgment was granted.' "[5]

"The standard of review applicable to a superior court's denial of a motion for a new trial based upon alleged juror misconduct is the abuse of discretion standard."[6] "This court 'will not disturb a trial court's decision on [a motion for a new trial] except in exceptional circumstances to prevent a miscarriage of justice.' "[7]

Finally, "[w]hether the superior court applied the appropriate legal standard in its consideration of a fee petition presents a question of law that we review de novo."[8] Once we have identified the appropriate standard, "we review awards of attorney's fees

---

[4]    *Mills v. Hankla*, 297 P.3d 158, 165 (Alaska 2013) (internal citation omitted) (quoting *Wright v. State*, 824 P.2d 718, 720 (Alaska 1992)).

[5]    *Becker v. Fred Meyer Stores, Inc.*, 335 P.3d 1110, 1113 (Alaska 2014) (alteration in original) (footnote omitted) (first quoting *Lockwood v. Geico Gen. Ins. Co.*, 323 P.3d 691, 696 (Alaska 2014); and then quoting *Hoendermis v. Advanced Physical Therapy, Inc.*, 251 P.3d 346, 351 (Alaska 2011)).

[6]    *Van Huff v. Sohio Alaska Petroleum Co.*, 835 P.2d 1181, 1187 (Alaska 1992) (citing *West v. State*, 409 P.2d 847, 852 (Alaska 1966)).

[7]    *Id.* (alteration in original) (quoting *Buoy v. Era Helicopters, Inc.*, 771 P.2d 439, 442 (Alaska 1989)).

[8]    *Powell v. Powell*, 194 P.3d 364, 368 (Alaska 2008).

for an abuse of discretion."[9]  "Abuse exists if the [superior] court's decision 'is arbitrary, capricious, manifestly unreasonable, or the result of an improper motive.' "[10]

## IV.   DISCUSSION

### A.   The Superior Court Did Not Err By Granting Summary Judgment.

Thomas's amended complaint asserted five causes of action against the State; the superior court granted summary judgment on all of them before reinstating Thomas's First Amendment claim on reconsideration.  Thomas contends that the grant of summary judgment as to his other claims is reversible error.  We do not agree.

"Alaska Civil Rule 56 provides for judgment to be granted to a party where 'there is no genuine issue as to any material fact' and 'the moving party is entitled to judgment as a matter of law.' "[11]  "[A] party seeking summary judgment has the initial burden of proving, through admissible evidence, that there are no disputed issues of material fact and that the moving party is entitled to judgment as a matter of law."[12]  "Once the moving party has made that showing, the burden shifts to the non-moving party 'to set forth specific facts showing that he could produce evidence reasonably

---

[9]      *Wagner v. Wagner*, 183 P.3d 1265, 1266 (Alaska 2008) (citing *Ware v. Ware*, 161 P.3d 1188, 1192 (Alaska 2007)).

[10]      *Weimer v. Cont'l Car & Truck, LLC*, 237 P.3d 610, 613 (Alaska 2010) (quoting *Monzingo v. Alaska Air Grp., Inc.*, 112 P.3d 655, 659 (Alaska 2005)).

[11]      *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 517 (Alaska 2014) (quoting Alaska R. Civ. P. 56(c)).

[12]      *Mitchell v. Teck Cominco Alaska Inc.*, 193 P.3d 751, 760 n.25 (Alaska 2008) (citing *Shade v. Co & Anglo Alaska Serv. Corp.*, 901 P.2d 434, 437 (Alaska 1995)).

tending to dispute or contradict the movant's evidence and thus demonstrate that a material issue of fact exists.' "[13]

### 1. There was no genuine issue of material fact precluding summary judgment on Thomas's due process claim.

One of Thomas's causes of action cited 42 U.S.C. § 1983 and alleged that he was deprived of due process in the course of the proceedings that resulted in his termination; he alleged specifically that he was not informed before the hearing of the allegations made by Ocean Beauty and Alaska Airlines.[14] "To sustain an action under 42 U.S.C. § 1983, [a claimant] must show: (1) that the conduct complained of was committed by a person acting under color of state law and (2) that the conduct deprived the plaintiff of a constitutional right."[15] Public employees, because of their recognized property interest in continued employment, have a constitutional due process right to a pre-termination hearing.[16] "At a minimum, the employee must receive oral or written notice of the proposed discharge, an explanation of the employer's evidence[,] and an opportunity to present his position."[17]

---

[13] *Christensen*, 335 P.3d at 517 (quoting *State, Dep't of Highways v. Green*, 586 P.2d 595, 606 n.32 (Alaska 1978)).

[14] Thomas also alleged as a basis of his due process claim that McIntire, his then-acting supervisor, "was unavailable for cross-examination" at the time of his first investigatory hearing, apparently in reference to the February 2008 email exchange. He does not pursue this assertion on appeal.

[15] *Okpik v. City of Barrow*, 230 P.3d 672, 677 (Alaska 2010) (alteration in original) (quoting *Crawford v. Kemp*, 139 P.3d 1249, 1255 n.10 (Alaska 2006)).

[16] *City of North Pole v. Zabek*, 934 P.2d 1292, 1297 (Alaska 1997).

[17] *Storrs v. Municipality of Anchorage*, 721 P.2d 1146, 1149 (Alaska 1986). The hearing procedure "should provide an initial check against a mistaken decision by
(continued...)

In granting summary judgment to the State on Thomas's § 1983 claim, the superior court reasoned that the constitutional minimum had been satisfied: "Thomas was provided with 'notice and opportunity for hearing appropriate to the nature of the case.' "[18] Thomas contends this was error because the State "did not fully explain its evidence" against him. On appeal he cites the Department's failure to give him a copy of the Environmental Crimes Unit's report before the hearing, though he does not cogently explain how the report would have helped his defense.[19] And the law requires only that the State provide Thomas with an explanation of the evidence against him, not necessarily every piece of it.

The written notice of the "investigatory interview" that led to Thomas's termination advised him that "on Tuesday, August 25, 2009, while in travel status for the State of Alaska, you engaged in inappropriate and unprofessional communication and behavior while performing your duties in your capacity as an Environmental Health Officer III." The letter, dated September 17, scheduled the interview for the following day; it informed him the interview would be his "only opportunity to provide explanation or mitigating facts prior to a determination regarding possible administrative action" and warned that the allegations against him, "[i]f substantiated, . . . may result in discipline up to termination."

---

[17](...continued)
the employer, ensuring that there are reasonable grounds to believe the allegations against the employee are true." *Id.*

[18]     The superior court's quoted phrase is from *Zabek*, 934 P.2d at 1297.

[19]     Thomas argues that it was unusual for the Environmental Crimes Unit to be involved in the investigation of a State employee's conduct "when no [c]riminal [a]ctivity was suspected" and implies that he could have attacked the report's credibility on that basis. But he provides no record support for the claim that this was a suspicious use of the Unit's expertise.

Though the letter was short on detail, Thomas had learned of the complaint over two weeks earlier, soon after his return from Cordova. In an email to a coworker on September 2, he explained that a supervisor had informed him that he was "being investigated as a consequence of a complaint by Alaska Airlines"; he had therefore begun "composing [a] narrative of events for the investigation while fresh in [his] mind." The record does not fully explain how he learned the details of the complaints against him, but the transcript of the September 18 interview demonstrates that he came prepared to address them. He brought copies of photos he had taken on the tarmac and inside the airport, and he read his lengthy narrative of events, providing a copy to one of the interviewers.[20] He cited the statutes and regulations he believed applied to the situation and responded to the interviewers' pointed questions about other witnesses' accounts, his demeanor and communications at the scene, and the procedures he used to test the fish. The interview lasted about an hour; it clearly "allow[ed] the administrative authority to examine both sides of the controversy."[21] Since Thomas received "notice of the proposed discharge, an explanation of the employer's evidence[,] and an opportunity to present his position,"[22] we agree with the superior court that there was no genuine issue of material fact precluding summary judgment for the State on Thomas's due process claim.

---

[20]     Attending the interview besides Thomas were a human resources manager, Thomas's supervisors Pressley and Klein, and a union representative.

[21]     *Nichols v. Eckert*, 504 P.2d 1359, 1365 (Alaska 1973).

[22]     *Storrs*, 721 P.2d at 1149.

## 2. There was no genuine issue of material fact precluding summary judgment on Thomas's claim for breach of the covenant of good faith and fair dealing.

"Every employment contract in Alaska is subject to the implied convent of good faith and fair dealing."[23] "The covenant contains both objective and subjective components. An employer can breach either component."[24] "[T]he objective component 'prohibits the employer from dealing with the employee in a manner that a reasonable person would regard as unfair.' "[25] The subjective component requires proof that "the employer's termination decision was 'actually . . . motivated by an improper or impermissible objective' — that the decision 'was actually made in bad faith.' "[26] Proof of subjective bad faith requires more than "[t]he employee's own speculation" and

---

[23] *Crowley v. State, Dep't of Health & Soc. Servs.*, 253 P.3d 1226, 1230 (Alaska 2011) (citing *Smith v. Anchorage Sch. Dist.*, 240 P.3d 834, 844 (Alaska 2010)).

[24] *Hoendermis v. Advanced Physical Therapy, Inc.*, 251 P.3d 346, 356 (Alaska 2011) (internal citation omitted) (citing *Charles v. Interior Reg'l Hous. Auth.*, 55 P.3d 57, 62 (Alaska 2002)).

[25] *Lentine v. State*, 282 P.3d 369, 376 (Alaska 2012) (quoting *Mitchell v. Teck Cominco Alaska, Inc.*, 193 P.3d 751, 761 (Alaska 2008)). Thomas makes a terse argument based on the test's objective component, contending that the Department's treatment of him was objectively unreasonable because another seafood inspector was not terminated for emails that "were every bit as hostile as" Thomas's (though the other employee was eventually "forced into voluntary resignation" for drinking while driving a State vehicle). The superior court held that the two men were not similarly situated. "[S]imilarly situated employees are those who are members of the same class, as defined by job position and the nature of the alleged misconduct." *Hoendermis*, 251 P.3d at 357. Thomas's wholly unsourced description of the other employee's circumstances gives us no basis on which to conclude that the superior court erred in its holding.

[26] *Crowley*, 253 P.3d at 1230 (alteration in original) (quoting *Era Aviation, Inc. v. Seekins*, 973 P.2d 1137, 1141 (Alaska 1999)).

"personal feelings of unfairness" about the employer's motives.[27]  Here, in granting summary judgment on Thomas's claim that the Department breached the covenant, the superior court found no evidentiary support for his theory that he was fired in retaliation for his ethics complaint — only Thomas's own "speculation and personal feelings of unfairness."

Thomas appears to take a different tack on appeal, arguing that there was a genuine issue of material fact involving what he terms the "ghost-written" email McIntire sent him in February 2008, when Thomas was resisting McIntire's request that he track down a constituent's identity.[28]  Thomas contends that the email, drafted with the help of a human resources specialist, was intended to goad him into making an insubordinate response and therefore was in subjective bad faith.  The State argues, on the other hand, that there can be no evidence of bad faith in the fact that an acting supervisor seeks the assistance of those with expertise in personnel issues when drafting a potentially sensitive communication to an employee.

The State does not dispute that McIntire sought advice from the personnel division before he drafted his email.  We must simply decide whether, on the undisputed facts, the State was entitled to judgment as a matter of law on Thomas's claim.[29]  We agree with the superior court that the undisputed facts themselves provide no evidence of subjective bad faith.  Thomas's argument depends instead on speculation about the

---

[27]    *Id.*

[28]    McIntire's email informed Thomas that he was expected to "politely and professionally[] make the calls to track down who [he] spoke to," suggested some sources for him to check, reminded him that he represented the Department in his dealings with the public, and asked for the requested information "as soon as possible, hopefully by this afternoon."

[29]    Alaska R. Civ. P. 56(c).

actors' motives: He contends that the Department's representatives intentionally drafted an email that he would find "patronizing" and that would provoke him to respond inappropriately. His speculation is not enough to support his claim.

### 3. Whether the State was entitled to summary judgment on Thomas's whistleblower and wrongful termination claims is moot because the jury rejected the factual basis of the claims.

Thomas next asserts that the superior court erred in dismissing his "whistleblower claim" under AS 39.90.100. The State counters that Thomas "fully and fairly litigat[ed] his basic theory that he was fired in retaliation for making an ethics complaint," and the jury rejected that theory. We agree: Thomas's whistleblower claim had the same factual basis as the First Amendment claim that was presented to the jury and decided against him.

"To bring suit under the Whistleblower Act 'an employee must show that (1) she has engaged in protected activity and (2) the activity was a "substantial" or "motivating factor" in her termination.' "[30] "Reporting a matter of public concern to a public body is 'protected activity.' "[31] Thomas went to trial only on his First Amendment claim, which required that he prove the following: "(1) he was subjected to an adverse employment action, . . . (2) he engaged in speech that was constitutionally protected because it touched on a matter of public concern[,] and (3) the protected expression was a substantial motivating factor for the adverse action."[32]

---

[30] *Okpik v. City of Barrow*, 230 P.3d 672, 678 (Alaska 2010) (quoting *Hammond v. State, Dep't of Transp. & Pub. Facilities*, 107 P.3d 871, 874 n.5 (Alaska 2005)).

[31] *Id.*

[32] *Sengupta v. Univ. of Alaska*, 139 P.3d 572, 576 (Alaska 2006) (quoting *Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 976 (9th Cir. 2002)).

The "protected activity" that Thomas alleged as a necessary element of the whistleblower claim was the same activity that he alleged as a necessary element of the First Amendment claim: his report of the director's alleged ethics violation.[33] To succeed on either claim he had to prove that the report was a substantial motivating factor in his termination. The jury answered "no" when asked on the special verdict form whether Thomas's "filing of the ethics complaint against Director Ryan [was] a substantial or motivating factor for the State of Alaska's termination of his employment." The jury's rejection of the factual basis for his whistleblower claim moots his argument that the superior court erred by deciding it on summary judgment.[34]

Thomas's first amended complaint asserted a separate cause of action for wrongful termination, alleging that he was terminated in retaliation for two protected activities: (1) "fil[ing] a complaint with the Attorney General's office," i.e., the ethics

---

[33] Thomas also appears to argue that his whistleblower claim encompassed the Department's "use of dishonest and deceitful baiting e-mails" because he was disciplined for his own email responses after having claimed whistleblower status. But Thomas does not explain why the communications for which he was disciplined should be viewed as "protected activities." Public employers are prohibited "from retaliating against employees or prospective employees for engaging in *constitutionally protected expression*," *id.* (emphasis added); not every instance of workplace speech is constitutionally protected, as Thomas apparently contends.

[34] *See, e.g., Rockstad v. Erikson*, 113 P.3d 1215, 1221 (Alaska 2005) (holding that any error in the court's grant of summary judgment against a borrower on his statute of limitations defense was harmless where evidence at trial showed a later payment that revived the debt); *see also Martin v. Cty. of San Diego*, 512 F. App'x 677, 679 (9th Cir. 2013) (holding that a challenge to the district court's grant of summary judgment to the county on a § 1983 claim based on a deputy sheriff's allegedly misleading warrant application was mooted by the jury's verdict in favor of the deputy); *Hinkle v. City of Clarksburg, W. Va.*, 81 F.3d 416, 420-21 (4th Cir. 1996) (holding that a challenge to the district court's grant of summary judgment on excessive force claims against "non-shooting officers, a supervisor, or the City" was mooted by the jury's verdict in favor of the shooting officer).

complaint against the director; and (2) his "[u]nion activity and his history of filing grievances." His brief on appeal mentions the wrongful termination claim but does not provide a factual or legal basis on which to analyze it separately from his whistleblower claim. To the extent the wrongful termination claim is not governed by our discussion of the whistleblower claim, we consider the issue waived.[35]

## B. The Superior Court Did Not Abuse Its Discretion In Denying Thomas's Motion For An Evidentiary Hearing Or New Trial Based On Alleged Juror Misconduct.

Thomas argues that the superior court erred when it refused to grant him an evidentiary hearing or new trial after he raised allegations of juror misconduct. In support of a post-trial motion, Thomas submitted his own affidavit relating conversations he had with one juror after trial. According to Thomas, the juror told him that another juror demanded that deliberations end by a certain time; that other jurors said demeaning things about Thomas's appearance; that some jurors falsely claimed to have seen Thomas "selling or handing out pickles on the street corner" across from the court house; and that one juror acted "like a school yard bully." Thomas asserts in his brief that the juror he spoke to also submitted an affidavit to the presiding judge of the Third Judicial District stating his concerns, but this affidavit is not in our record.

Whether the superior court should have considered Thomas's proffered evidence is governed by Alaska Evidence Rule 606(b), which provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not be questioned as to any matter or statement occurring during the course of the jury's deliberations or to the effect of any matter or statement upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or

---

[35] *Hymes v. DeRamus*, 222 P.3d 874, 887 (Alaska 2010) ("[I]ssues not argued in opening appellate briefs are waived. This rule applies equally to pro se litigants.").

concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

In *Titus v. State* we identified the competing interests addressed by Rule 606(b): Its "general ban on using juror testimony to impeach verdicts" is intended "to protect jurors from harassment, to encourage free jury deliberation, and to promote the finality of verdicts," while the exceptions to the general ban are designed to "protect[] the interest in avoiding injustice" by allowing juror testimony in those "situations where irregularities have marred the integrity of the deliberation process."[36] The exceptional situations identified by the rule involve "extraneous prejudicial information . . . improperly brought to the jury's attention" and "outside influence . . . improperly brought to bear upon any juror."[37]

None of the allegations in Thomas's affidavit satisfy these narrow exceptions. The superior court did not abuse its discretion when it denied his motion for an evidentiary hearing or new trial based on jury misconduct.

---

[36] 963 P.2d 258, 261 (Alaska 1998); *see also* Alaska R. Evid. 606(b) cmt. (summarizing the policy behind the rule as "to insulate the deliberative process and to promote finality of verdicts while not foreclosing testimony as to the extrinsic forces erroneously injected into the process").

[37] *Larson v. State*, 79 P.3d 650, 654 (Alaska App. 2003).

C.	**The Superior Court Did Not Err In Its Attorney's Fees Award**.

Finally, Thomas argues that the superior court erred when it awarded the State $75,000 in attorney's fees, which was the presumptively reasonable 30% of the State's reasonable, actual attorney's fees pursuant to the Alaska Civil Rule 82(b)(2) schedule. Thomas makes a number of arguments, but his primary ones are that the size of the award unconstitutionally restricted his access to the courts and that he was a public interest litigant exempt from the application of Rule 82. We conclude that there was no error.

1.	**The State's attorney's fees award does not unconstitutionally block access to the courts.**

We have acknowledged the possibility that a fee award could be "too high" and thereby deny a litigant's right of access to the courts.[38] But we have upheld fee awards in employment cases comparable to the award at issue here.[39] And Rule 82 provides a safeguard against awards that would deter access by allowing courts to consider "the extent to which a given fee award may be so onerous to the non-prevailing party that it would deter similarly situated litigants from the voluntary use of the courts."[40]

---

[38]	*State v. Native Vill. of Nunapitchuk*, 156 P.3d 389, 406 (Alaska 2007).

[39]	*See, e.g.*, *Lentine v. State*, 282 P.3d 369 (Alaska 2012) (affirming award of over $50,000 against former employee of Department of Fish & Game despite her claims that the equities weighed in her favor); *Van Huff v. Sohio Alaska Petroleum Co.*, 835 P.2d 1181, 1188-89 (Alaska 1992) (explaining that because the "the case was actively pending over five years, there was extensive pretrial discovery, numerous complex legal issues were briefed and argued before the trial court, the trial lasted thirteen days, and Sohio won a total victory in the case," a $117,251.50 award was appropriate).

[40]	Alaska R. Civ. P. 82(b)(3)(I); *see Gold Country Estates Pres. Grp., Inc. v. Fairbanks N. Star Borough*, 270 P.3d 787, 799-800 (Alaska 2012) (observing that this
(continued...)

Here, the State's itemized billing records and affidavits support the presumptive award. An assistant attorney general described the two years of pretrial activity as involving "a myriad of issues and complaints spanning the twenty-plus years [Thomas] worked for the State," a description reflected in the issues on appeal. Thomas's discovery requests for years of electronic records required "review of approximately 26,867 emails and 3 [gigabytes] of data for privilege, relevance, or applicability to the discovery requests or the case in general." Trial lasted ten days. Thomas made no attempt to show actual financial harm that would indicate he was deterred from using the courts. Given these circumstances, we cannot say that a presumptive award of fees based on the Rule 82(b)(2) schedule was an abuse of discretion. And because the award was reasonable, in both its amount and its apparent effect on Thomas, it did not impermissibly infringe on his right of access to the courts.[41]

---

[40](...continued) rule provision requires superior court judges to "consider whether an award of attorney's fees will impair the constitutional right of access to the courts" (quoting *Bozarth v. Atlantic Richfield Oil Co.*, 833 P.2d 2, 6 (Alaska 1992) (Matthews, J. dissenting))).

[41] Thomas takes issue with the State's billing rates and hours he contends were "excessive and duplicative." We have considered these arguments as well and conclude they have no merit. *See Atlantic Richfield Co. v. State*, 723 P.2d 1249, 1252 (Alaska 1986) ("One permissible way to calculate fees for assistant attorneys general is to use an average hourly billing rate for private attorneys. . . . We find no error in the state's use of the Department of Law study to fix the hourly rate for assistant attorneys general."); *Belluomini v. Fred Meyer of Alaska, Inc.*, 993 P.2d 1009, 1017 (Alaska 1999) ("It is . . . for the trial judge to determine whether too much time was spent by attorneys for the prevailing party or whether too many attorneys were employed." (alteration in original) (quoting *Integrated Res. Equity Corp. v. Fairbanks N. Star Borough*, 799 P.2d 295, 304 (Alaska 1990))).

Thomas also relies on *Continental Insurance Co. v. U.S. Fidelity & Guaranty Co.*, 552 P.2d 1122, 1128 (Alaska 1976), to argue that Rule 82 does not allow (continued...)

## 2. Thomas is not exempt from an attorney's fee award.

Thomas next asserts that he is a public interest litigant who should be exempt from the application of Rule 82.  Under AS 09.60.010, parties may be exempt from attorney's fees awards only in cases concerning "the establishment, protection, or enforcement of a right under the United States Constitution or the Constitution of the State of Alaska."[42]  The claim on which Thomas went to trial was based on the First Amendment to the United States Constitution.  But a litigant claiming the protection of the statute must also prove that "the action or appeal asserting the right was not frivolous, and the claimant did not have sufficient economic incentive to bring the action."[43]  "A litigant has sufficient economic incentive to bring a claim when it is brought primarily to advance the litigant's direct economic interest," something we generally discern by examining "two factors — the nature of the claim and relief sought and the direct economic interest at stake."[44]

---

[41](...continued) awards of fees for in-house counsel like the State's assistant attorneys general.  But we have clarified *Continental*, explaining that "[n]othing in *Continental* was intended to alter our long-standing practice of awarding attorney's fees to public entities who litigate chiefly, and often entirely, through in-house counsel." *Greater Anchorage Area Borough v. Sisters of Charity of House of Providence*, 573 P.2d 862, 863 (Alaska 1978).

[42]     AS 09.60.010(c).  "In 2003 the Alaska Legislature abrogated and replaced our public interest litigation exception to Rule 82 with" AS 09.60.010, which "encourages and protects parties bringing constitutional claims." *Alaska Conservation Found. v. Pebble Ltd. P'ship*, 350 P.3d 273, 280 (Alaska 2015)

[43]     *Id.* at 280-81 (quoting AS 09.60.010(c)(2)).

[44]     *Id.* at 281-82 (holding that the legislature's change in the public interest litigation statute was intended to maintain the court's previous holdings regarding what constituted "sufficient economic incentive").  In considering the nature of the claim, we look to "statements made in the pleadings and proceedings about the rationale for the
(continued...)

Thomas's claims, though varied, were based on his loss of State employment. His initial complaint sought "[c]ompensatory damages less mitigation at $800,000," "[u]ndetermined future, and consequential damages," post-judgment interest, "[s]tatutory damages as allowed by specified laws," and "[u]ndetermined special damages." His amended complaint broke down his damages request into five separate claims in excess of $100,000 each. On appeal he explains that the State's actions forced him to file suit because he was no longer eligible for rehire by other State departments. The record strongly supports the conclusion that Thomas's primary purpose in filing suit was monetary recovery, rehire rights, or both. Because he had "sufficient economic incentive to bring the action" despite his constitutional claims, the superior court did not err when it failed to give him the protection of AS 09.60.010.[45]

V. CONCLUSION

The judgment of the superior court is AFFIRMED.

---

[44](...continued)
lawsuit, to whether the relief requested was equitable or legal, and the amount of money in controversy." *Id.* at 282 (internal citations omitted). Our primary goal is to find "the litigant's primary motivation for filing the suit." *Id.* (quoting *O'Callaghan v. State*, 920 P.2d 1387, 1390 (Alaska 1996)).

[45] As in *Pebble Limited Partnership*, 350 P.3d at 284 n.60, we find it unnecessary to determine the standard of review applicable to determinations of constitutional litigant status under AS 09.60.010, as we would affirm the superior court's decision in this case regardless of the standard.